1
2
3
4
5
# UNITED STATES DISTRICT COURT

6
## FOR THE EASTERN DISTRICT OF CALIFORNIA

7
### FRESNO DIVISION

8

9
KOU CHA,

CASE NO. 06cv1672-IEG(AJB)

10
                               Petitioner,

**ORDER DENYING 28 U.S.C. § 2254 PETITION FOR WRIT OF HABEAS CORPUS**

vs.

11

12
JAMES E. TILTON, Secretary of the
California Dept. of Corrections and
Rehabilitation (CDCR); A. K. SCRIBNER,

13
Warden,

14
                               Respondents.

15
        Proceeding with the assistance of counsel, petitioner Kou Cha ("Cha"), a state prisoner serving

16
a determinate sentence of 49 years, seeks a 28 U.S.C. § 2254 writ of habeas corpus. A jury convicted

17
Cha in June 2003 of four counts of assault with a firearm and one count of felon in possession of a

18
firearm, with gang findings. He alleges five grounds for relief: (1) denial of due process, equal

19
protection, and a fair trial in the prosecutor's use of peremptory challenges; (2) insufficient evidence

20
to support the gang enhancements under an unconstitutionally vague statute; (3) instructional error;

21
(4) the prosecutor's summation violated due process; and (5) violation of due process associated with

22
sentence enhancements based on impermissible court fact-finding. Respondents filed an Answer, and

23
Cha filed a Traverse. After careful consideration of relevant portions of the record, the parties'

24
arguments, and pertinent legal authority, for the reasons discussed below, the Petition is **DENIED**.

25
## I.    BACKGROUND

26
###     A.    Factual Background

27
        Cha was charged with multiple felonies following shootings during an incident at the Fresno

28
Fairgrounds in December 2002. The parties do not dispute the factual findings recited by the California

Court of Appeal in affirming his conviction and sentence on direct appeal, reproduced *verbatim* in Respondent's Answer. Federal courts presume the correctness of a state court's determination of a factual issue, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On December 26, 2002, M.V., Foua Moua, Chau Vue, and Chai Thao were leaving the Hmong New Year festivities at the Fresno Fairgrounds when they were shot. Eighty-eight-year-old Chau Vue fell to the ground after she was shot. She did not see who shot her. Nine-year-old M.V. did not see the person who shot her.

Koung Vang was working security for the Hmong New Year on December 26 when he saw defendant and a number of other people in a dispute. Vang knew defendant prior to this occasion. Defendant was wearing a red sweater with white stripes on the arms. Someone threw a club or a similar item at defendant. Defendant stepped up toward the gate, pulled out a gun, and started firing. Vang saw shell casings expended from the gun that defendant was firing. Vang recalled three shots being fired. Defendant ran off.

Vang did not report what he saw that day because he had to leave his work at the fairgrounds to go work at a party, he saw that the police had defendant in custody, and he knew defendant was a member of the Oriental Ruthless Boys gang. Vang picked defendant from a photographic lineup and was 100 percent positive he was the shooter. Vang saw only one shooter.

Vang testified that he knows the difference between a semiautomatic gun and a revolver. The gun was black in color. He confirmed to the defense investigator, Darren Hise, that the gun he saw defendant shoot was a semiautomatic.

Chau Vue's young grandson was with her when he heard several shots. After some of the shots were fired, the grandson looked and saw a shooter wearing black with slicked back hair.

Robert Patton was an armed security guard working in the parking lot of the Fresno Fairgrounds at the Hmong New Year festival. He heard numerous shots being fired. Ben Snyder, one of the other security officers, communicated with him and gave him descriptions of two individuals fitting the shooting suspects' descriptions. One of the descriptions was of an individual wearing a red shirt with white stripes.

Patton saw defendant run through the parking lot and jump the fence. Patton continued to watch defendant until he was apprehended by the police. Defendant was wearing a red sweater with white stripes. He did not have anything in his hands. Officer Gary Beer received a description from Patton of defendant. Beer apprehended defendant as he was walking away from the fairgrounds.

Jerome Torres, another security guard in the area, saw defendant and another male in a dark jacket run through the parking lot after the shooting. Defendant had a shaved head.

Criminalist Stephen John O'Clair examined the cartridge cases and unspent cartridges located at the crime scene. He examined three nine-millimeter Luger cartridge cases and two unfired nine-millimeter Luger cartridges.

It was O'Clair's opinion that all three of the cartridge cases were fired from the same gun. The cartridges were similar to the cartridge cases, but O'Clair was not able to positively say that the cartridges had been chambered in the same weapon from which the recovered cartridge cases had been fired, although they probably came from the same weapon. The cartridges and the cartridge cases all came from a semiautomatic weapon.

O'Clair also examined two lead fragments and a copper jacket recovered from one of the victims. He could not say that the items recovered from the victim came from the same weapon as the expended casings found at the scene, although he believed that they probably did come from the same weapon.

Police detective Michael Harris testified that Jennifer Xiong identified defendant as a shooter in a photographic lineup.

Police detective Scott Moore presented testimony to support his opinion that defendant is a member of the Oriental Ruthless Boys criminal street gang and the crimes were committed for the benefit of the gang.

**Defense**

Several witnesses testified to incidents showing that Koung Vang was more familiar with defendant than he indicated in his testimony. In particular, witnesses testified that Vang's friends and defendant's friends had fought and that Vang had asked defendant to help him fight some other individuals.

Chong Vue said he was stopped in the street in front of the fairgrounds. He saw and heard people arguing for about 10 minutes. He did not see anyone in a red sweater in the group. He saw a male dressed in dark clothing fire a semiautomatic weapon. He only saw one shooter and, although he heard approximately five shots, he only saw the shooter in dark clothing fire the first two shots before Vue covered himself.

Ben Snyder was working security in the parking lot. He saw only one shooter. The shooter was dressed in dark clothing and had dark hair. He had a black handgun that looked like a semiautomatic weapon. He did not see a person in red, and denied describing the clothing of the shooter when he radioed to Patton about the shooting. He heard shots, and when he turned he saw the man in dark clothing fire two more rounds.

M. X. was in the parking lot at the fairgrounds waiting for a ride from her mother. She heard three gunshots but did not see a gun. She did not recall telling an officer that she saw a man dressed in black firing a revolver. She said she was afraid to be in court.

- 3 -

1  |  Long Xiong was waiting outside the fairgrounds for a ride. He
2  |  heard an argument among individuals wearing dark clothing. He heard gunshots. He saw someone wearing dark clothing with a gun.

3  |  Jennifer Xiong was at the Hmong New Year festival when her
4  |  friend, Foua, was shot. Two groups were arguing. Jennifer saw the shooter fire two or three shots. She described the shooter as wearing
5  |  black, with spiky hair. Although Jennifer had seen defendant earlier, the shooter was not defendant. She said the shooter was holding a
6  |  semiautomatic weapon. She knew what a semiautomatic weapon looked like because she had been raped at gunpoint when she was a
7  |  child. Defendant is her best friend's cousin. Jennifer was shown photographs after the shooting and testified that she was asked to pick
8  |  out people she knew. She picked out the defendant's picture. She denied that she was asked to pick out pictures of the shooter/shooters.

9  (Ans. pp. 6-7, *quoting* Lodg. 3, pp. 2-5; *see* Traverse p. 1, *citing* Pet. Exh. A, pp. 35-65.).

10  **B.**   **Procedural Background**

11  A First Amended Complaint filed February 13, 2003 charged Cha with nine felonies: **Count**

12  **One**, assault with a firearm on Maycha Vang, in violation of CAL. PEN. CODE § 245(a)(2), with

13  personal use of a handgun (CAL. PEN. CODE § 12022.5(a)(1)), with infliction of great bodily injury

14  (CAL. PEN. CODE § 12022.7(a)) causing the offense to become a serious felony (CAL. PEN. CODE §

15  1192.7(c)(8)) and a violent felony (CAL. PEN. CODE § 667.5(c)(8)); **Count Two**, assault with a

16  semiautomatic firearm on Maycha Vang, in violation of CAL. PEN. CODE § 245(b), with personal use

17  of a handgun (CAL. PEN. CODE § 12022.5(a)(1)), with infliction of great bodily injury (CAL. PEN. CODE

18  § 12022.7(a)) causing the offense to become a serious felony (CAL. PEN. CODE § 1192.7(c)(8)) and a

19  violent felony (CAL. PEN. CODE § 667.5(c)(8)); **Count Three**, the same allegations as in Count One,

20  identifying the victim as Foua Moua; **Count Four**, the same allegations as in Count Two, identifying

21  the victim as Foua Moua; **Count Five**, the same allegations as in Count One, identifying the victim as

22  Chau Vue; **Count Six**, the same allegations as in Count Two, identifying the victim as Chau Vue;

23  **Count Seven**, the same allegations as in Count One, identifying the victim as Chai Thao; **Count Eight**,

24  the same allegations as in Count Two, identifying the victim as assault with a semiautomatic firearm

25  on Chai Thao; and **Count Nine**, possession of a firearm by a felon, citing two prior convictions from

26  2001 and 2002, one of which was identified as a prior serious felony conviction, or "strike."[1]  The

27  complaint also alleged the crimes in Counts One through Eight were eligible for gang enhancements,

28

---

[1] Two misdemeanor charges were dismissed in consideration of the prison sentence. (SRT 1323.)

citing CAL. PEN. CODE § 186.22 (b)(1) (crimes committed in, for the benefit of, at the direction of, or associated with a criminal street gang, and with the specific intent to promote, further, or assist in the criminal conduct of the street gang). (CT[2] 21-25.)

The case was tried over five days in June 2003. (CT 234-259.) The jury deliberated one hour on June 17, 2003. They deliberated for the entire day on June 18, 2003, received responses to their written questions and readback of testimony, then forwarded a note: "After many hours of deliberation we have failed to reach a consensus." (CT 264-268.) On June 19, 2003, the court supplemented their instructions, authorized additional readback of testimony. Trial proceedings concluded at mid-day with rendered verdicts. (CT 269-270.) The jury found Cha not guilty of Counts One, Three, Five, and Seven. They convicted him of Counts Two, Four, Six, and Eight, with findings as to each he personally used a firearm, the crime was a gang offense, but he did not personally inflict great bodily injury, with an additional true finding under Count Six the victim is a person aged at least 70 years within the meaning of CAL. PEN. CODE § 12022.7(c). The jury also convicted him of Count Nine, felon in possession of a firearm, with a gang offense finding. (CT 273-285, 364-376.) He was sentenced on August 14, 2003 to a determinate term of 49 years in prison, comprised of: nine years on Count 6, with the arming allegation adding 10 years and the gang allegation adding another 10 years (totaling 29 years); two years each for Counts 2, 4, and 8 (a total of six years), with an additional 16 months for the arming allegations in each (a total of four additional years); and 40 months for each of the Counts 2, 4, and 8 gang allegations (a total of 10 additional years). (CT 399; Pet. p. 2.)

Cha appealed, contending, as pertinent here: the prosecutor's use of peremptory challenges was motivated by group bias; insufficient evidence supported the gang enhancement; prosecutorial misconduct in the giving of a perfunctory closing argument, then an extensive rebuttal argument, precluding an effective defense reply; and coercion of jury verdicts through the court's supplemental instructions to a hung jury and refusal to instruct the jury it did not have to reach a verdict, coupled with one juror's personal time constraints. (Pet. pp. 2-4.) On May 12, 2005, the Court of Appeal affirmed the judgment. (Lodg. 3; Pet. Exh. A, pp. 35-65.)

---

[2] "CT" refers to Lodgment 7, the Clerk's Transcript; "RT" refers to the Reporter's Transcripts provided as Lodgment 6; "SRT" refers to Supplemental Reporter's Transcript, provided after Lodgment 6, Vol. VI.

1    Cha filed a Petition For Review in the California Supreme Court on June 21, 2005. (Pet.

2    Exh. A, pp. 1-65.) He presented the following questions, as pertinent here: (1) whether he was denied

3    due process and equal protection under Batson v. Kentucky, 476 U.S. 79 (1986) and Johnson v.

4    California, 545 U.S. 162 (2005) in the prosecutor's use of peremptory challenges; (2) whether

5    conviction of a gang enhancement requires a finding the defendant knew gang members had engaged

6    in a pattern of criminal gang activity; (3) whether the court's supplemental instructions to a hung jury

7    coupled with a juror's self-imposed time limits for deliberations coerced the jury into reaching its

8    decisions; (4) whether the prosecutor's conduct in the structuring of his closing argument violated due

9    process; and (5) whether Cha was sentenced in violation of Blakely v. Washington, 542 U.S. 296

10   (2004) and United States v. Booker, 543 U.S.220 (2005). (Pet. Exh. A, pp. 2-3.) Review was denied

11   on August 24, 2005, in an *en banc* Order stating in its entirety:

12              Petition for review denied without prejudice to any relief which
              defendant might be entitled upon finality of *People v. Black* (2005) 35 Cal.4th
13              1238 regarding the effect of *Blakely v. Washington* (2004) 542 U.S. __, 124
              S.Ct. 2531, and *United States v. Booker* (2005) 543 U.S. __, 125 S.Ct. 738, on
14              California Law.

15   (Pet. Exh. A, p. 66; [Unnumbered] Lodgment.)

16             Proceeding *pro se*, Cha thereafter filed three identical habeas petitions in the state courts: in

17   the Fresno County Superior Court (filed within the first three months of 2006 and denied during that

18   same period); in the California Court of Appeal, Fifth Appellate District, on April 17, 2006 (denied May

19   26, 2006); and in the California Supreme Court as Case No. S145847 on August 15, 2006. (Pet. pp.

20   5-12, 16; Pet. Exh. B.) Respondents concede all Cha's federal claims are exhausted, and the federal

21   Petition was timely filed on November 20, 2006.[3] This case became fully briefed on March 25, 2008,

22   with the filing of Cha's Traverse. (Dkt No. 13.) On November 25, 2008, the matter was reassigned

23   from the bench of the United States District Court for the Eastern District of California to visiting judge

24   Irma E. Gonzalez, Chief Judge, United States District Court for the Southern District of California.

25   (Dkt No. 14.)

26   **II.    DISCUSSION**

27

28        [3] The abeyance or unexhausted claims abandonment requests in Cha's federal Petition were mooted by
     the state high court's June 20, 2007 denial of his last state petition. (Pet. pp. 19-20.)

## A.    Legal Standards

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a) (West 2006).  Only errors of federal law can support federal intervention in state court proceedings, and only to correct such errors.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989).  Federal habeas courts are bound by states' interpretations of their own laws.  Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003); Estelle v. McGuire, 502 U.S. 62, 68 (1991).

Federal habeas petitions filed after April 24, 1996 are decided under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to **any claim that was adjudicated on the merits** in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was **contrary to, or involved an unreasonable application of, clearly established Federal law**, as determined by the Supreme Court of the United States; **or**
>
> (2) resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

" '[C]learly established Federal law . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.' " Carey v. Musladin, 549 U.S. 70, 74 (2006), *quoting* Williams v. Taylor, 529 U.S. 362, 412 (2000) (the lack of a United States Supreme Court holding on an issue precludes federal habeas relief); *see also* Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002) (distinguishing the "contrary to" and the "unreasonable application" clauses, with the latter requiring a finding of objective unreasonableness, not merely incorrectness).  AEDPA establishes a " 'highly deferential standard for evaluating state-court rulings.' " Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citation omitted).

The denial of a petition by the state's highest court "without comment or citation constitute[s] a decision on the merits of the federal claims," and "such claims [are] subject to review in federal habeas proceedings." Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992).  Where there is no reasoned

decision from the state's highest court, the federal court "looks through" to the rationale of the underlying decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

**B.    Merits**

**1.    Ground One:  Peremptory Challenges**

Cha argues he was denied due process, equal protection, and his right to a fair and impartial jury on grounds the prosecutor used peremptory challenges  in a racially-motivated way to excuse two Hispanic jurors.  He argues "the Court of Appeal's findings on the issue are both 'an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding,' " and "the Court of Appeal's decision is contrary to, or involved an unreasonable application of, 'clearly established Federal law. . . ,' " citing <u>Batson</u>, 476 U.S. 79 and <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995). (Traverse, pp. 1, 10-11, *quoting* 28 U.S.C. § 2254(d)(1), (2).)

State law defines the right, purpose, and manner of exercise of peremptory challenges.  <u>Ross v. Oklahoma</u>, 487 U.S. 81, 89 (1988).  In California, "no reason need be given for a peremptory challenge, and the court shall exclude any juror challenged peremptorily." CAL. CODE CIV. P. § 226(b). Nevertheless, the California Supreme Court in <u>People v. Wheeler</u>, 22 Cal.3d 258, 276 (1978) applied the representative cross-section rule of the California Constitution to prohibit the use of peremptory challenges to systematically exclude jurors based on such characteristics as race, religion, or ethnicity. *See* CAL. CODE CIV. P. § 231.5.  Clearly established United States Supreme Court authority creates a similar prohibition.  <u>Batson</u>, 476 U.S. at 84, 106 (purposeful racial discrimination in the selection process violates equal protection).  The factual inquiry under both <u>Wheeler</u> and <u>Batson</u> is the same, and a <u>Wheeler</u> objection at trial is equivalent to a <u>Batson</u> challenge, preserving a defendant's <u>Batson</u> claim for purposes of federal habeas review.  <u>Paulino v. Castro</u>, 371 F.3d 1083, 1088-89, n.4 (9th Cir. 2004); *see* <u>Fernandez v. Roe</u>, 286 F.3d 1073, 1075 (9th Cir. 2002).

\\

"The <u>Batson</u> framework is designed to produce actual answers to suspicions and inferences that

discrimination may have infected the jury selection process." <u>Johnson</u> 545 U.S. 172, *citing* <u>Batson</u>, 476 U.S. at 97-98 and n.20.  The inquiry proceeds in three steps:

> Under our <u>Batson</u> jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).  If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. . . .  The second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991).

<u>Purkett</u>, 514 U.S. at 767-68 (parallel citations omitted) ("It is not until the *third* step that the persuasiveness of the justification becomes relevant," with the "burden of persuasion regarding racial motivation . . . never shift[ing] from[] the opponent of the strike"); <u>Johnson</u>, 545 U.S. at 171 ("The first two <u>Batson</u> steps govern the production of evidence that allows the trial court to determine [at step three] the persuasiveness of the defendant's constitutional claim").

To satisfy step one, the defendant must show he or she "is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."[4]  <u>Johnson</u>, 545 U.S. at 169, *quoting* <u>Batson</u>, 476 U.S., at 96.  The defendant must also raise an inference, through facts and relevant circumstances, the prosecutor used peremptory challenges "to exclude the veniremen from the petit jury on account of their race." <u>Id.</u> *quoting* <u>Batson</u>, 476 U.S. at 96.  "[A] *prima facie* case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " <u>Id.</u>, *quoting* <u>Batson</u>, 476 U.S., at 94.  The inquiry ends if the defendant fails to make a *prima facie* showing at step one.  <u>Batson</u>, 476 U.S. at 96-97.

If a defendant satisfies step one, the burden shifts to the prosecution at step two to rebut the inference of bias by articulating a neutral reason(s) for the peremptory challenge(s).  <u>Purkett</u>, 514 U.S. at 768.  The reasons need not be objective to be acceptable, as long as they are not pretexts for the

---

[4]  "The Supreme Court has 'liberalized <u>Batson</u> and abolished the requirement that the defendant and the stricken juror share the same race.' " <u>Paulino v. Castro</u>, 371 F.3d 1083, 1091, fn.6 (9th Cir. 2004); *see* <u>Powers v. Ohio</u>, 499 U.S. 400, 402 (1991); <u>Tolbert v. Page</u>, 182 F.3d 677, 680 n.4 (9th Cir. 1999) (*en banc*).

systematic exclusion of members of a cognizable group.  People v. Gray, 87 Cal.App.4th 781, 788-89 (2001) (inquiring whether the prosecutor had "any legitimate, nonsuspect reasons for excusing the jurors in question"); People v. Hall, 35 Cal.3d 161, 170 (1983) (even "hunches" can furnish acceptable reasons).  At step two, courts focus on the subjective genuineness of the responding party's explanation of a neutral, nonracial motive, not the objective reasonableness of the explanation itself.  Hernandez, 500 U.S. at 363; see Purkett, 514 U.S. at 768; see also People v. Reynoso, 31 Cal.4th 903, 924 (2003).

Just days before Cha filed his Petition For Review in the California Supreme Court, the Johnson Court clarified the standard for satisfaction of the *prima facie* showing at step one of a Wheeler/Batson analysis,  resolving a conflict between the standard applied by the Supreme Court of California and the standard applied by the Ninth Circuit Court of Appeals, rejecting California's higher standard.[5]  A *prima facie* case is made "by showing that the totality of relevant facts gives rise to an inference of discriminatory purpose", without the need to show either a "strong likelihood" or that it is "more likely than not" the other party's peremptory challenges were based on impermissible group bias.  Johnson, 545 U.S. at 168-69, 164.

Jury selection for Cha's trial began June 11, 2003, with the court's general *voir dire* followed by questions from counsel for each side, and resumed June 12, 2003.  (CT 236; SRT 1, 132.)  The prosecutor and defense counsel each exercised five peremptory challenges.  The prosecutor's first was to strike Jerry Hernandez (SRT 67), and his fourth was to strike Ramiro Garcia (SRT 112).  There is no dispute Cha belongs to a group of persons of Asian ancestry cognizable for Batson analysis purposes.  Mr. Hernandez and Mr. Garcia are Hispanics, another cognizable group.  After the jury and two alternates were sworn (SRT 156, 161-162, 167), Cha's counsel made his  Wheeler motion:

> THE COURT: . . . Mr. Sok, you approached the court in chambers and said you wished to orally argue a Wheeler motion; is that correct?
>
> MR. SOK: Yes, Your Honor.  Thank you.
>
> THE COURT:  And what is the basis of your Wheeler motion?
>
> MR. SOK:  Yes, Your Honor.  I believe that yesterday the prosecution has dismissed on peremptory challenge, Mr. Hernandez and Mr. Garcia.

---

[5]  "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by Batson."  Johnson, 545 U.S. at 173, 168 (deciding the "the scope of the first of [the] three steps this Court enumerated in Batson, which together guide trial courts' constitutional review of peremptory strikes").

When I voir -- during the voir dire **I didn't see anything they said that they were -- that they were prejudiced to one party or the other and show disqualification**, and they are a **recognized group** in the [*sic*] Spanish males, both of them are Spanish males, and **based on that**, Your Honor, I make my Wheeler motion, and I believe and to [*sic*] wish to get a new jury panel. [¶] Thank you.

THE COURT: Well, Mr. Sok, **I see absolutely no basis for recognizing a Wheeler motion** in that there are two Hispanics left on the panel -- I mean, in the jury box and there are a number left on the panel, and I also might point out that you -- that **there's nothing that they said that would detect any bias against your client** . . . .

(RT 23-24.)

In support of the motion, counsel advanced only his own perception the excused jurors showed no "prejudice[] to one party or the other" nor "show[ed] disqualification," accompanied by an allusion to their race. He identified no fact or circumstance suggesting the prosecutor was motivated by racially discriminatory bias in excusing them. It is presumed peremptory challenges are exercised in a constitutional manner, and the racial or ethnic characteristics of prospective jurors, standing alone, does not prevent their exclusion. <u>People v. Alvarez</u>, 14 Cal.4th 155, 193 (1996), *citing* <u>Wheeler</u>, 22 Cal.3d at 278 and <u>Batson</u>, 476 U.S. at 89-98. The prosecutor has no obligation to articulate any reason before exercising a peremptory challenge unless and until the opposing party makes a *prima facie* showing of discriminatory motivation. *See* CAL. CODE CIV. P. § 226(b). Cha's trial court determined he failed to carry his burden at step one and denied the motion, terminating the inquiry.

The Court of Appeal affirmed that result citing only <u>Wheeler</u>, in an opinion issued before the United States Supreme Court in <u>Johnson</u>, 545 U.S. 162 established the <u>Batson</u> "reasonable inference" standard, rather than the <u>Wheeler</u> "strong likelihood" standard, is the appropriate test at step one. Nevertheless, the Court of Appeal used both the "reasonable inference" language from the <u>Batson's</u> standard and <u>Wheeler's</u> "more likely than not" language in its decision.[6] Other California courts had

_____

[6] Quoting <u>People v. Griffin</u>, 33 Cal.4th 536, 554-55 (2004), the Court of Appeal stated: " 'Under <u>Wheeler</u>, there is a **presumption that a prosecutor who employs a peremptory challenge against a prospective juror who is a member of a cognizable group does so for a purpose other than to discriminate**. . . . If a defendant believes that the prosecutor is using a peremptory challenge for a discriminatory purpose, the defendant "must raise the point in a timely fashion." . . . At the threshold, the defendant must establish a "prima facie case of [purposeful] discrimination." . . . "First, … [the defendant] should make as complete a record of the circumstances as is feasible." . . . "Second, [the defendant] must establish that the persons excluded are members of a cognizable group . . . ." . . . "Third, from all the circumstances of the case **[the defendant] must show a strong likelihood**". . . . *-- or, stated in other terms*, **must raise a "reasonable inference**" . . . -- "that

- 11 -                                                                06cv1672

1   equated the state's "strong likelihood" or "more likely than not" standard with the lower federal

2   standard even before Johnson.[7]  The trial court's determination Cha identified "no basis whatsoever"

3   to sustain a Wheeler objection permits the interpretation that court found he had not even raised an

4   inference of impermissible motivation.  Nevertheless, when the state court has used a wrong legal

5   standard, or it is unclear whether it did so, the AEDPA deference federal habeas courts owe state court

6   decisions does not apply.  Paulino, 371 F.3d at 1090 (if the state courts may have applied an overly-

7   stringent standard at step one, the federal habeas court reviews the Batson claim de novo).

8       The issue under de novo review remains "whether the circumstances of the prosecutor's

9   challenges 'raise an inference' of exclusion based on race [satisfying step one], such that inquiry into the

10  prosecution's motives is required under Batson."  Fernandez, 286 F.3d at 1078; Wade v. Terhune, 202

11  F.3d 1190, 1198 (9th Cir. 2000); see Paulino, 371 F.3d at 1090 (finding the prosecutor's use of five of

12  his six peremptory challenges to remove five of the six potential black jurors satisfied defendant's prima

13  facie showing of prosecutorial bias).  This Court has independently reviewed the 167-page voir dire

14  record (SRT foll. p. 1327) and detects nothing suspect in the conduct of jury selection.  Unlike the

15  statistical imbalance evident in Paulino, the trial court noted two other Hispanics remained on Cha's jury

16  after Mr. Ramirez and Mr. Garcia were excused.  (SRT 23-24.)  Also unlike in Paulino, the trial court

17  did not engage in sua sponte speculation about the prosecutor's potential race-neutral reasons for

18  striking those potential jurors before defense counsel had the opportunity to articulate the basis for his

19  _____

20  such persons are being challenged because of their group association rather than because of any specific bias".
    . . . In order **to demonstrate such a "strong likelihood," or raise such a "reasonable inference,"** the defendant

21  **"must show that it is more likely than not** the [prosecutor's] peremptory challenges, if unexplained, were based
    on impermissible group bias" or purposeful discrimination. . . .  **If the defendant succeeds in establishing a**

22  **prima facie case of such discrimination, the prosecutor must articulate neutral reasons explaining the**
    **peremptory challenges in question.** . . . Ultimately, the defendant must prove purposeful discrimination. . .

23  . If the defendant succeeds in proving such discrimination, the trial court must dismiss any jurors thus far
    selected and sworn, and quash any remaining venire. . . .' "  (Lodg. 3, pp. 7-8 (emphasis added.).)

24      [7]  The California Supreme Court confirmed in People v. Box, 23 Cal.4th 1153, 1188 n.7 (2000) the
    state's "strong likelihood" standard was the equivalent of the Batson "reasonable inference" standard.  Paulino,

25  371 F.3d at 1090, n.5.  Due to some confusion created by a state appellate court decision overruled in Box, "as
    we explained in Cooperwood v. Cambra, 245 F.3d 1042, 1047 (9th Cir. 2001), we continue to review de novo

26  in pre-Box cases where the state court employed Wheeler's 'strong likelihood' standard."  Paulino, 371 F.3d at
    1090 (" 'California courts in following the "strong likelihood" language of Wheeler are not applying the correct

27  legal standard for a prima facie case under Batson' "), quoting Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir.
    2000) (the Wheeler standard "is impermissibly stringent in comparison to the more generous Batson 'inference'

28  test").  Cha's is not a "pre-Box case," so it is likely his Court of Appeal applied the correct standard, equating
    the Wheeler and the Batson prima facie showing requirements, particularly as it used both terms.

Wheeler objection.[8] *Cf.* Paulino, 371 F.3d at 1089-90, 1092 (remanding the matter for a hearing to give the state "an opportunity to present evidence as to the prosecutor's race-neutral reasons for the apparently-biased pattern of peremptories," because at step two of the Batson analysis "it does not matter that the prosecutor might have had good reasons to strike the prospective jurors," but rather "[w]hat matters is the *real* reason they were stricken").

Cha identifies no "facts" or "other relevant circumstances" adequate in the totality of the circumstances to raise an inference racial discrimination motivated the prosecutor to excuse two of four Hispanics from Cha's jury   Johnson, 545 U.S. at 170.  On this record, the Court is unable to find the trial court erred in terminating the Batson inquiry at step one for Cha's failure make a *prima facie* showing.[9]  Accordingly, habeas relief on Ground One of the Petition is **DENIED**.

### 2.    Ground Two:  Gang Enhancement

Cha argues California's gang enhancement statute "as applied, is void for vagueness and is simply unconstitutional," relying on Kolender v. Lawson, 461 U.S. 352, 357 (1983) for the general proposition "[d]ue process of law requires that criminal statutes be reasonably definite." (Traverse 20:12-13.) The void-for-vagueness doctrine addresses whether: (1) a penal statute defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.  Kolender, 461 U.S. at 357; *see* Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 524-25 (1994). Participation in a street gang is criminalized by California's Street Terrorism Enforcement and Prevention Act, which provides, in pertinent part:

> (a) Any person who actively participates in any criminal street gang ***with knowledge that*** its members engage in or have engaged in a pattern of criminal gang activity, ***and*** who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang,

---

[8]  The Court of Appeal speculated from the *voir dire* record about potential unobjectionable reasons the prosecutor may have had to excuse Mr. Hernandez and Mr. Garcia.  However, such speculation was in support of its finding Cha did not carry his *prima facie* showing burden, not to substitute possible legitimate reasons for the *actual* reasons only the prosecutor himself could explain.  *See also* Answer pp. 17-18.

[9]  This finding disposes of Cha's suggestion an evidentiary hearing should be held "to give the prosecutor a chance to offer a race-neutral explanation . . . so that this District Court may determine whether the prosecutor violated Batson." (Traverse 13:20-27.)  His vague contention the "voir dire transcripts show that [the] differences between the struck jurors and other jurors were not significant and that the prosecutor *may have engaged in* disparate *questioning*" (Traverse 13:20-22 (emphasis added)) is unsupported speculation.

- 13 -

shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.

(b)(1) Except as provided in paragraphs (4) and (5), any person who is **convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang,** *with the specific intent to* **promote, further, or assist in any criminal conduct by gang members,** shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: . . .

CAL. PEN. CODE § 186.22 (emphasis added).

The statute thus embodies two essential elements: (1) the defendant committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang; and (2) the defendant intended to assist, further, or promote criminal conduct by gang members. CAL. PEN. CODE § 186.22(b)(1); People v. Gardeley, 14 Cal.4th 605, 615-16 (1997); People v. Olguin, 31 Cal.App.4th 1355, 1382 (1994). Cha challenges the codified knowledge element as providing inadequate notice "that his alleged conduct was proscribed by statute." (Traverse 20: 13-16.) His void for vagueness argument fails from the face of the statute. By its plain terms, the scienter element is defined as the specific intent to promote, further, or assist gang members when committing a felony offense. CAL. PEN. CODE § 186.22(b)(1). Embodiment of scienter or *mens rea* requirements in statutory language "alleviate[s] vagueness concerns." Gonzales v. Carhart, 550 U.S. 124, --, 127 S.Ct. 1610, 1628 (2007), *citing, inter alia,* Posters 'N' Things, 511 U.S. at 526. As found by the Court of Appeal, the statute is sufficiently definite for notice and defines the elements of the crime in a manner that circumscribes prosecutorial discretion. (Lodg. 3, pp. 15-16.)

Cha also argues there was insufficient evidence to support the jury's gang findings. California applies the clearly established federal due process standard for sufficiency of evidence reviews. People v. Johnson, 26 Cal.3d 557, 575-78 (1980), *citing* Jackson v. Virginia, 443 U.S. 30 (1979). The reviewing court's "critical inquiry" is "whether the record could reasonably support a finding of guilt beyond a reasonable doubt" applied "with explicit reference to the substantive elements of the criminal offense" as defined by state law. Jackson, 443 U.S. at 318 (footnote omitted), 324, n. 16. Evidence is sufficient as long as any rational trier of fact could have been persuaded of the defendant's guilt, viewing the result in the light most favorable to the judgment and drawing all reasonable inferences

from the evidence which support the jury's verdict. Id. at 319. On habeas review, federal courts inquire whether the state court's holding involved an objectively unreasonable application of Jackson. Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 n. 13 (9th Cir. 2005).

Cha urges a reading of the statute requiring knowledge of criminal activity *other than* the crime at issue, arguing: "there was no testimony the gang committed these types of criminal assaults with the intent to further *other* specific criminal activity of the ORB [Oriental Ruthless Boys] gang." (Traverse 19:27-20:6.) In rejecting this claim, the Court of Appeal first interpreted the code sections:

> A violation of Penal Code section 186.22, subdivision (a) is a substantive crime. . . . [¶] Defendant was charged with the criminal street gang enhancement. That crime is set forth in Penal Code section 186.22, subdivision (b). . . . [¶] To prove a violation of subdivision (b) the prosecution must prove "that **the crime for which the defendant was convicted *had been 'committed for* the benefit of, at the direction of, or in association with any criminal street gang, *with the specific intent to* promote, further, or assist in any criminal conduct by gang members.**' (§ 186.22, subd. (b)(1) and former subd. (c).)[10]

(Lodg. 3, pp. 14-15 (emphasis added) (quoting People v. Gardeley 14 Cal.4th 605, 616-617 (1996).)

The Court of Appeal found California courts have rejected Cha's interpretation:

> Defendant's argument was rejected in People v. Gamez (1991) 235 Cal. App. 3d 957 (*disapproved on other grounds in* People v. Gardeley, *supra*, 14 Cal.4th at p. 624, fn. 10). The court found that **the enhancement does not require that the defendant had knowledge that the gang members had engaged in a pattern of criminal gang activity**. Furthermore, **the statute contained a sufficient standard of conduct proscribing a defendant's activities and a sufficiently clear standard for police enforcement and the determination of guilt.** "In short, an individual who violates subdivision (b) does so at the peril that the history of his gang will reveal the predicate offenses." (People v. Gamez, *supra*, at p. 976.) We agree with the reasoning of Gamez and reject defendant's request that we not follow it.

(Lodg. 3, pp. 14-16 (emphasis added).)

Cha relies on a Ninth Circuit panel's different interpretation of the CAL. PEN. CODE § 186.22(b)(1) phrase "any criminal conduct" in support of this claim. In Garcia v. Carey, 395 F.3d

---

[10] "In addition, **the prosecution must prove that the gang** (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e) and (f).) ' (People v. Gardeley (1996) 14 Cal.4th 605, 616-617, italics in original)." (Lodg. 3, pp. 14-16(?) (emphasis added).)

1099, 1103, 1105 (9th Cir. 2005), the majority affirmed a grant of federal habeas relief on grounds "there is no evidence indicating that this robbery was committed with the specific purpose of furthering **other gang criminal activity**, and there is nothing inherent in the robbery that would indicate it **furthers some other crime**" (emphasis added). (Traverse p. 20.) The <u>Garcia</u> court found the evidence of specific intent was insufficient to support the enhancement, observing it would reach the same result whether it "review[ed] directly under <u>Jackson</u> or whether [it] review[ed] more deferentially the state court's application of <u>Jackson</u> under AEDPA's standard." <u>Garcia</u>, 395 F.3d at 1102.

Although the California Supreme Court has not yet addressed the issue, the Ninth Circuit opinion is at odds with certain state appellate courts' construction of the statute, including some expressly disagreeing with the <u>Garcia</u> majority's interpretation.[11] *See, e.g.*, <u>People v. Hill</u>, 142 Cal.App. 4th 770, 774 (2006), *cert. den. sub nom* <u>Hill v. California</u>, -- U.S. --, 128 S.Ct. 191 (2007) (stating the Ninth Circuit misinterpreted California law in <u>Garcia</u>), *agreeing with* <u>People v. Romero</u>, 140 Cal.App.4th 15, 19 (2006) ("By its plain language, the statute requires a showing of specific intent to promote further or assist in '*any* criminal conduct by gang members,' rather than *other* criminal conduct," finding "evidence [defendant] intended to commit a crime, that he intended to help [another] commit a crime, and that he knew [that other] was a member of his gang" supported "a reasonable inference that [defendant] possessed the specific intent to further [the other's] criminal conduct").

Competing principles thus affect this Court's review of the claim. "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (*per curiam*); <u>People v. Burnett</u>, 110 Cal.App.4th 868, 882 (2003) (federal authority is not binding in matters involving state law); *but see* <u>Johnson v. Riverside Healthcare System</u>, 534 F.3d 1116, 1125 (9th Cir. 2008) ("[I]n interpreting state law, [federal reviewing courts] are bound to follow the decisions of the state's highest

---

[11] In addition, some federal decisions subsequent to <u>Garcia</u> have rejected its interpretation in consideration of the state courts' disagreement. *See, e.g.*, <u>Hill v. Woodford</u>, 2008 WL 5234726 (E.D.Cal. Dec. 16, 2008) *12, *13 n. 14 ("There is no requirement in section 186.22, subdivision (b), that the defendant's intent to assist criminal endeavors by gang members must relate to criminal activity apart from the offense being committed," noting "the Ninth Circuit [in <u>Garcia</u>] appears to be directly at odds with California state appellate courts' interpretation of state law"), *citing* <u>People v. Martinez</u>, 158 Cal.App.4th 1324, 1332 (2008), <u>People v. Morales</u>, 112 Cal.App.4th 1176, 1179 (2003). The <u>Garcia</u> court was not deciding the "other" criminal conduct interpretation as a contested issue, nor were the California cases cited in the <u>Garcia</u> majority opinion.

court," and "when the state's highest court has not spoken on an issue, we must determine what result the court would reach if we were standing in its shoes by examining 'state appellate court opinions, statutes and treatises' ") (citation omitted).

A recent Ninth Circuit opinion applies the Garcia result in consideration of Gardeley, 14 Cal.4th 605, the only California Supreme Court decision to have addressed CAL. PEN. CODE § 186.22(b) in the sufficiency of evidence context. *See* Briceno v. Scribner, 2009 WL 426303 (9th Cir. Feb. 23, 2009) ("Briceno") (the majority applying the Jackson standard in consideration of Garcia and Gardeley to hold that admission of a police gang investigator's expert testimony did not violate the defendant's rights to due process and a fair trial,[12] but that expert testimony was insufficient to establish the defendant committed the charged robberies with specific intent to benefit a criminal street gang, reversing denial of federal habeas relief). On the sufficiency of evidence issue, the Briceno court emphasized the importance of keeping analytically separate the two elements for a CAL. PEN. CODE § 186.22(b)(1) gang enhancement (*i.e.*, first, the prosecutor must demonstrate the defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang," and second, the prosecutor must show that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members") inasmuch as " 'mere membership in a criminal street gang' " standing alone is not enough to satisfy the second step. Briceno at *7, *citing* Garcia, 395 F.3d at 1102-03 & n.5. The court applied the "*other* criminal activity" interpretation from Garcia to find the state court's analysis "represents an unreasonable application of the Jackson standard. . . , " finding "a total failure of proof of the requisite specific intent." Briceno at *7-8, *quoting* Garcia, 395 F.3d at 1104 (holding "[w]ithout this evidentiary link, it is unreasonable to conclude that a rational jury could find that Garcia committed this robbery with the specific intent to facilitate other gang

---

[12] The Briceno court disposed of the admission of opinion testimony challenge by declining to review the state court's application of its own Evidence Code: "[E]vidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right of due process." Briceno at *6, *citing* Estelle, 502 U.S. at 67-68, 72. That court court found "no cases 'support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier or fact." Briceno at *6, *quoting* Moses v. Payne, 543 F.3d 1090, 1105-06 (9th Cir. 2008) (although witnesses are "not permitted to give a direct opinion about the defendant's guilt or innocence, . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact" without violating the Constitution); *see* Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (the rule permitting opinion testimony on ultimate issues is well established).

06cv1672

1   crimes").

2          In reaching its result, the <u>Briceno</u> majority rejected the state's argument that intervening

3   California Courts of Appeal cases disapproved <u>Garcia</u>'s "other criminal activity" interpretation of that

4   portion of the statute, attempting a reconciliation of <u>Garcia</u> with <u>Gardeley</u> on the sufficiency of evidence

5   issue.[13]  *See* <u>Briceno</u> at * 8-10.  "Our task is therefore to determine whether, after <u>Romero</u> and <u>Hill</u>,

6   there remain convincing reasons to believe that the California Supreme Court would hold the sentencing

7   enhancements available under § 186.22(b) inapplicable to Briceno's case."  <u>Id.</u> at * 9.  The <u>Briceno</u>

8   dissent disagreed with the majority's interpretation of <u>Gardeley</u> and its reliance on <u>Garcia</u>, among other

9   things.[14]   Nevertheless, the majority ultimately decided the matter on the particular evidentiary

10

11       [13]  "Although we are ordinarily bound by a state's highest court's interpretation of its own statute, *see*
<u>Dimidowich v. Bell & Howell</u>, 803 F.2d 1473, 1482 (9th Cir.1986), **none of the post-<u>Garcia</u> cases cited by the**

12   **State were decided by the California Supreme Court, which has yet to address this issue. This panel would**
**therefore normally be bound by the prior panel's decision in <u>Garcia</u>, which expressly rejected the same**

13   **interpretation of § 186.22(b) advanced by the State in this case. The State argues, however, that**
**intervening case law in the lower state courts, *i.e.*, <u>Romero</u> and <u>Hill</u>, has cast doubt on <u>Garcia</u>.**  'In the

14   absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the
intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state

15   would decide differently.'  <u>Owen ex rel. Owen v. United States</u>, 713 F.2d 1461, 1464 (9th Cir.1983) (internal
quotation marks omitted); *see also* <u>In re Watts</u>, 298 F.3d 1077, 1082-83 (9th Cir.2002)."  <u>Briceno</u> at * 9.

16

17       [14]   The dissent criticizes the majority as "[r]elying on an erroneous interpretation of" <u>Gardeley</u>, 14
Cal.4th 605, "the one California Supreme Court pronouncement on gang enhancements," resulting in an

18   erroneous conclusion "the California Supreme Court would decide the specific intent question differently from
the Court of Appeal."  <u>Briceno</u> at *13 (Wardlaw, J. concurring in part and dissenting in part).  "<u>Gardeley</u> stands

19   for the proposition that the statute 'does not criminalize mere gang membership,' but it "does not support the
contention that the majority purports to make – that the [California] Supreme Court would  hold that the

20   commission of a crime with another gang member is insufficient to establish specific intent to 'assist in any
criminal conduct by gang members.'"  <u>Id.</u>  The dissent also finds "inappropriate" the majority's holding that "the

21   California Court of Appeal's analysis runs afoul of this court's decision in <u>Garcia</u>" (<u>Id.</u> at *8), because "[t]he
California state court was not bound by <u>Garcia</u> in its interpretation of section 186.22(b); nor may we analyze

22   the state court's opinion for compliance therewith.  We review the state court's decision only to determine whether
it reasonably applied 'clearly established Federal law,' defined as 'the governing legal principle or principles set

23   forth by the Supreme Court at the time the state court renders its decision.' "  <u>Id.</u> at *15, *quoting* Lockyer, 538
U.S. at 71-72.  "Clearly, <u>Garcia</u> does not fit that definition," and the "applicable federal law is the <u>Jackson</u>

24   standard [only], and there is no indication that the state court unreasonably held that a rational tier of fact could
have found the gang enhancement true beyond a reasonable doubt.  Our reasoning in <u>Garcia</u>, then, is only

25   persuasive authority that should be rejected when, as here, it is contrary to the state's own interpretation of its
statute."  <u>Id.</u>, *citing* <u>Dimidowich</u>, 803 F.2d at 1482.  The dissent also notes "California courts could not have

26   indicated more clearly that our interpretation of section 186.22(b) was incorrect," as "<u>Garcia</u> has been explicitly
disapproved in two subsequent California Court Appeal decision."  <u>Id.</u>, *citing* <u>Romero</u>, 43 Cal.Rptr.3d at 865,

27   <u>Hill</u>, 47 Cal.Rptr.3d at 877.  Finally, the dissent observes "<u>Garcia</u> is not directly applicable because <u>Garcia</u> did
not address the situation here:  two gang members committing a crime together."  <u>Id.</u> at *16.  Lastly, the dissent

28   faults the majority for "completely ignor[ing]" precedent for the proposition "when the California Supreme Court
denies a petition for hearing without citation or comment, it will be assumed that the state supreme court has been
given a fair opportunity to review the merits of the petitioner's claim."  <u>Id</u> at *14, n. 6.

deficiencies in that case to hold the state appellate court's conclusion represented an unreasonable application of the <u>Jackson</u> standard, granting habeas relief on that claim.[15] <u>Briceno</u> at *11. Irrespective of which construction ultimately is adopted by the California Supreme Court on this point, the <u>Briceno</u> result was predicated on the lack of adequate direct or circumstantial evidence to support the gang enhancement. <u>Id.</u> at *10 ("Thus, even if we were to defer to the state courts' post-<u>Garcia</u> interpretation of § 186.22(b), it is not at all clear that a gang enhancement could be sustained in this case").

This Court takes the legal principles from the <u>Briceno</u> majority as binding here, but finds the factual distinctions between that case and this do not mandate an insufficiency of the evidence result in Cha's favor. The types of evidence the <u>Gardeley</u> court found adequate to sustain a gang enhancement on the intent element, and which the <u>Briceno</u> court found lacking in the record before it, included such indicia as the involvement of more than one gang member, the public nature of the crime, and expert opinion the location of the crimes was consistent with intimidation of others to dissuade them from reporting the crimes or some similar motivation. <u>Gardeley</u>, 14 Cal.4th at 722. The expert's testimony in <u>Briceno</u> "dealt almost exclusively in hypothethicals," so his testimony did not "nor could it" establish the defendant's specific intent in committing the robberies. <u>Briceno</u> at *8. "Even when asked whether he had 'an opinion as to whether or not [the robberies] . . . were committed . . . with intent to promote, further and assist criminal conduct by members of the Hard Times gang," the expert "did not provide such an opinion," responding instead in "generalities," stating such crimes "glorif[ied] the gang and increased the status of the offenders." <u>Id.</u> Although the majority acknowledged that testimony "might have helped to establish the first element of the gang enhancement, *i.e.*, that the crime ultimately benefitted the gang in some way, it found such testimony "says nothing about Briceno's *specific intent* in committing the robberies." <u>Id.</u> at * 9-10.

---

[15] The dissent disagreed "that the state court unreasonably interpreted its own law in finding that the gang enhancement was supported by sufficient evidence," because when "there is no controlling 'pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state[,] unless there is convincing evidence that the highest court of the state would decide differently." <u>Briceno</u> at *12, *quoting* <u>Owen</u>, 713 F.2d at 1464). "[U]nder the reasoning in <u>Morales</u>, [People v.] Villalobos, [145 Cal.App.4th 310, 51 Cal.Rptr.3d 678, 687 (2007)], and <u>Romero</u>, [Briceno's co-defendant]'s crimes qualify as 'any criminal conduct by gang members,' and Briceno's purposeful assistance to [his co-defendant] in this criminal conduct qualifies as 'specific intent to . . . assist' in that criminal conduct." <u>Briceno</u> at *12 ( contending the reasoning in the cited cases "controls our decision because there is no 'convincing evidence that the highest court of the state would decide differently' "). <u>Id.</u> (citation omitted).

06cv1672

The primary evidence supporting the gang enhancement in Cha's case was also expert testimony, from Fresno County Sheriff's Detective Scott Moore. (RT 346-391.) *See* People v. Ferraez, 112 Cal.App.4th 925, 930-31 (2003) (California law permits juries to rely on expert testimony about gang culture and habits to prove specific intent to assist, further, or promote criminal conduct by gang members when reaching a verdict on a gang-related offense or a gang allegation). However, Detective Moore's testimony contains the type of evidence the Gardeley court identified as probative on the intent issue. The Briceno court reached its result based on the *absence* of evidence of gang activity indicia associated with the robberies: they were not committed in the defendant's gang's territory or the "turf" of a rival gang, neither Briceno nor his co-defendant made their gang membership known at the time, and there was no evidence from which to infer a connection between the gang and the purpose of the robberies (represented to be for the purpose of stealing money to Christmas shop). In contrast, the evidence in Cha's case substantiated the crimes were committed at an Asian festival, targeted Asian victims in a location where rival Asian gangs were likely present, the ORB gang announced its presence during the shootings, and there was evidence of two shooters acting in concert in furtherance of the criminal activity. Cha has the letters "ORB" tattooed across his back and "Ruthless" tattooed on his forearm, and it was Detective Moore's opinion Cha was an active ORB gang member when he committed the crimes. (RT 364-65.)

In addition, Detective Moore described an ongoing rivalry between Cha's ORB and the Asian Crips criminal street gangs. (RT 337-357.) He opined the crimes were committed for the benefit of the ORB gang because during the shooting, a gang member yelled out "ORB," a common practice to display gang pride and to let others know who committed the crime. (RT 366-367.) He testified gangs benefit from such assaults because those incidents increase a reputation for toughness and violence and augment a gang's power of intimidation over others, facilitating the commission of other crimes. (RT 367-368.) He testified the ORB gang had been involved in felony assaults, terrorist threats, assault weapon possession, robbery, burglary, drug activity, and murder. (RT 359-360.) His testimony established two specific predicate offenses by the ORB gang supported by certified copies of abstracts of judgment, qualifying as evidence of ongoing criminal activity. (RT 360-365.) The California Supreme Court sanctions such expert testimony and documentary evidence of criminal activity to prove

gang allegations. *See, e.g.*, <u>Gardeley</u>, 14 Cal.4th at 617-20, 605; <u>Hill</u>, 142 Cal.App.4th 770. "Federal habeas courts do not review questions of state evidentiary law." <u>Estelle</u>, 502 U.S. at 67-68.

For all the foregoing reasons, this Court finds the result is not contrary to nor an unreasonable application of <u>Jackson</u>. Sufficient evidence was presented to convince a rational trier of fact Cha acted with the specific intent to further, benefit, or promote criminal gang activity in his commission of the crimes. Accordingly, federal habeas relief on this theory is **DENIED**.

### 3. Ground Three: Verdict Coercion

Cha argues the combination of the trial court's supplemental instructions, its refusal to instruct the jurors they did not have to reach a verdict, and one juror's deliberation time constraints coerced the jury into reaching verdicts, in violation of his Fifth and Sixth Amendment rights to due process and a fair trial. He acknowledges: "Obviously, there are no *per se* rules rooted in the United States Constitution that would require the reversal of a conviction where a trial court polled a jury, gave a supplemental instruction, or commented upon the projected length of jury deliberations." (Traverse 26:19-22.) He further acknowledges the Supreme Court in <u>Early v. Packer</u>, 537 U.S. 3, 10 (2002) held the cases he cites for "illustrative purposes" (*i.e.*, <u>Jenkins v. United States</u>, 380 U.S. 445 (1965) and <u>United States v. United States Gypsum Co.</u>, 438 U.S. 422 (1978)) are "not relevant to the §2254(d)(1) determination since neither case sets forth a rule applicable to state court proceedings." (Traverse 27:11-17). He nevertheless summarily insists the "opinion of the California Court of Appeal was not only incorrect and erroneous" in its determination no jury coercion occurred, but also "it was 'objectively unreasonable,' in light of the facts presented in the trial court." (Traverse 27:18-20.)

The Court of Appeal quoted the pertinent portions of the record, then rejected the claim on the merits.[16] (Lodg. 3, pp. 19-20.) It found nothing inappropriate or coercive in the trial court's remarks

---

[16] Neither side contests the accuracy of the Court of Appeal's thorough summary: "The jury began deliberations at 4:10 p.m. on June 17, 2003. Shortly thereafter the juror foreperson sent three notes to the court. The first note stated that a juror needed to be excused on Thursday, June 19, due to vacation plans. The second request was for a readback of the testimony of Koung Vang describing his location at the time of the shooting and his location when he saw the shooter. The jury also requested a review of Patton's testimony of the radio call regarding the shooter. The jurors were advised that their requests would be addressed in the morning. [¶] The jury returned the next morning and began deliberations while the court discussed the jury's requests. The court reporter went into the jury room to read back testimony. The reporter concluded this at 10:00 a.m. That afternoon the jury sent out two questions. First, the jurors asked for an 'explanation of great bodily injury & intent.' They also asked if they could 'convict of one count of the counts 1 through 8.' [¶] The court and counsel

in response to the jurors' note they could not reach a verdict, nor in the supplemental charge, citing People v. Moore (2002) 96 Cal.App.4th 1105. Next, it found no error in the rejection of an instruction stating there is nothing illegal about a hung jury, citing People v. Gurule, 28 Cal.4th 557, 660 (2002) ("such an instruction could have improperly diminished the jury's duty to deliberate and reach a verdict if possible"). Finally, it found "nothing coercive in the fact that one of the jurors stated she would have to leave by noon on June 19th," because the trial court did not pressure the jury to reach a verdict before then and was prepared to substitute an alternate juror if need be. (Lodg. 3, pp. 19-22.)

Both sides acknowledge Lowenfield v. Phelps, 484 U.S. 231 (1988) supplies the clearly established federal law applicable to claims of jury coercion. Only a jury instruction that deprives a defendant of due process is deemed unconstitutionally coercive. Id. at 241. "The use of a supplemental

_____

discussed the questions and also discussed the note from the juror who said she needed to be excused the next day. The court determined that it would check with the jury at 4:30 p.m. to determine what to do about the juror who said she had to leave. The jurors were brought into the courtroom. The juror who asked to be dismissed said she would be able to deliberate the next day until about noon. The court told the jurors that they could convict on one count of counts 1 through 8, and to answer their questions about great bodily injury the court referred the jurors to the instructions. [¶] The following morning, June 19, the court called the jury into the courtroom to discuss the note they sent out late in the afternoon of the day before. The note read, 'After many hours of deliberation we have failed to reach a consensus.' [¶] The court expressed uncertainty of what the jury meant by its statement. It asked the foreperson to clarify if the jury had failed to reach a consensus on some of the charges and/or enhancements or all of the charges. The court cautioned the foreperson to not tell the court how many jurors voted one way or the other. The foreperson stated that they have failed to reach a consensus on all charges. [¶] The following then occurred: [¶] **'THE COURT: Do you feel that more deliberation would be more beneficial? [¶] All right. Now, I'm going to ask you, and don't tell me which way, I'm going to ask you what the breakdown was as to, you know, was it how many votes? [¶] JUROR SEAT NUMBER THREE: Nine to three.** [¶] **THE COURT: Okay. I'm going to give you some further instructions, and it is -- it has been my experience because I've been on the bench almost 22 years that a jury, which initially reported it was unable to reach verdicts, was ultimately able to arrive at verdicts on one or more of the counts before it. [¶] To assist you in your further deliberations I'm going to further instruct you as follows: Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes you. It is your duty as jurors to carefully consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen and to consider the views of your fellow jurors. [¶] In the course of your further deliberations you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine their views. You should not hesitate to change a view once you have -- once held, if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.'** [¶] The court repeated the standard jury instructions on how jurors should conduct their deliberations. The court then asked the jury to return to the jury room and continue with its deliberations. After the jury left the courtroom, the court indicated on the record that it had refused defense counsel's request to instruct the jury that a hung jury is not illegal [because:] 'Of course, it's not illegal. They know it's not illegal and … I have instructed them as to their duties and their responsibilities.' [¶] The jury continued to deliberate and asked a question about an assault and asked for the readback of the testimony of Chong Vue. These requests were answered and the jury continued to deliberate. The jury advised the court that they reached a verdict and at 12:39 p.m. the court reconvened to read the verdicts." ( Lodg. 3, pp. 14-16 (emphasis added).)

charge has long been sanctioned." Id. at 237-38, n.1, 241 (upholding a conviction and death sentence against the defendant's claim of coercion through the giving of a charge to the jury even less potentially coercive than the "traditional Allen charge"), citing Allen v. United States, 164 U.S. 492, 501-02 (1896) (upholding a conviction and sentence against the defendant's claim of coercion after the judge's charge to a hung jury urged the minority to consider the views of the majority). "All of the Federal Courts of Appeals have upheld some form of a supplemental jury charge." Id.. at 241. Cha's trial court did not suggest the jury had to reach a verdict. Cf. Jenkins, 380 U.S. at 446 (in the course of providing supplemental instructions, the judge improperly stated: "You have got to reach a decision in this case"). The court rejected defense counsel's request for a specific instruction because the jurors "were instructed to reach a verdict, **if they can do so.** That is telling them that if they can't do so, then they are obviously hung." (RT 944 (emphasis added); see also RT 938 ('[y]our goal as jurors should be to reach a fair and impartial verdict, if you are able to do so. . . ."); RT 939 ("[i]t is your duty as jurors to deliberate with the goal of arriving at a verdict, if you can do so, without violence to your own judgment"); RT 941 ("[e]ach of you must consider the evidence for the purpose of reaching a verdict, if you can do so").) The court directed the jury to carefully consider, weigh, and evaluate all of the evidence presented, to discuss their views, and to consider the views of their fellow jurors, but emphasized: "By suggesting you should consider changes in your methods of deliberations, I want to stress, I am not directing or instructing you as to how you conduct your deliberations." (RT 938-940.) The Court of Appeal reasonably found the trial court properly supplemented the instructions in a manner neither coercive nor otherwise constitutionally defective under Allen and Lowenfield.

Cha also argues the trial court improperly asked for the numerical split among the jurors. On the issue of the jury polling, the Lowenfield, the Court distinguished Brasfield v. United States, 272 U.S. 448 (1926). In Brasfield, the Supreme Court exercised its supervisory powers (as distinguished from any constitutional basis for the result) to conclude the trial court's inquiry as to how a stalled jury was divided numerically necessitated reversal of a guilty verdict because the question sought to learn

how the jury stood on the merits of the verdict.[17]  In contrast, in <u>Lowenfield</u>, the trial court permissibly asked the jury's numerical split to learn "how they stood on the question of whether further deliberations might assist them in returning a verdict."  <u>Lowenfield</u>, 484 U.S. at 240-41 (holding "the combination of the polling of the jury and the supplemental instruction was not 'coercive' in such a way as to deny petitioner any constitutional right").  Cha's trial court made a <u>Lowenfield</u>-type inquiry.  *See* fn 16, above. This Court finds the Court of Appeal reasonably rejected Cha's jury coercion theories in consideration of  the totality of the circumstances and did not unreasonably apply or reach a result contrary to United States Supreme Court authority.  Federal habeas relief on this ground is **<u>DENIED</u>**.

### 4.  <u>Ground Four:  Prosecutorial Misconduct During Summation</u>

Cha argues his due process rights were violated when the prosecutor made a "perfunctory" closing argument, then an extensive rebuttal argument, precluding an effective defense reply.  The prosecutor's closing argument consists of 17 transcribed pages orally delivered over a period of 28 minutes, followed by defense counsel's closing consisting of 30 pages of transcription orally delivered in 64 minutes, followed by the prosecutor's rebuttal, comprised of 47 transcript pages delivered over a period of one hour and 17 minutes.  (Traverse 28:8-11.)

The Court of Appeal rejected this argument, finding first Cha waived this claim as an appellate issue for failure to object at trial, raising this issue for the first time in his unsuccessful notion for a new trial.   (Lodg. 3, pp. 17-18; *see* SRT 1302-1305.).  The court also found the disparity between the opening and rebuttal argument here fell well short of the kind of disparity found to constitute prosecutorial misconduct. (Lodg. 3, pp. 18-19, *citing* <u>People v. Robinson</u>, 31 Cal.App.4th 494 (1995) (misconduct where a prosecutor gave an opening argument comprised of three reporter transcript pages, followed by a "rebuttal" argument ten times longer).)  Cha acknowledges "there is no specific United States Supreme Court decision directly on point."  (Traverse 33:11-12; *see* Ans. 32:20-27.)  Absent such authority, "it cannot be said that the state court 'unreasonably applied clearly established Federal law' " or reached a contrary result.  <u>Carey</u>, 549 U.S. at 77, *quoting* 28 U.S.C.  § 2254 (d)(1).

---

[17]  "Our decision in <u>Brasfield</u> makes no mention of the Due Process Clause or any other constitutional provision.  The Federal Courts of Appeals have uniformly rejected the notion that <u>Brasfield</u>'s *per se* reversal approach must be followed when reviewing state proceedings on habeas corpus." <u>Lowenfield</u>, 484 U.S. at 240, n. 3, *citing, inter alia,* <u>Locks v. Sumner</u>, 703 F.2d 403, 405-07 (9th Cir. 1983).

06cv1672

Cha alternatively argues this Court should grant habeas relief in reliance on Darden v. Wainwright, 477 U.S. 168, 181 (1986) (denial of due process may be found when the prosecutor's comments to a jury "so infected the trial with unfairness as to make the resulting conviction" unreliable) and Berger v. United States, 295 U.S. 78, 88 (1935), on the expansive theory United States Supreme Court cases recognize "that the prosecutor's duty is to refrain from improper methods calculated to produce a wrongful conviction." (Traverse 33:12-13.) His sweeping generalities fail to isolate any portion of the prosecutor's argument he maintains is inaccurate, misleading, false, or calculated to produce a wrongful conviction. Defense counsel had a fair opportunity to present Cha's case. The record confirms the prosecutor did not attempt in his rebuttal to introduce any new material or to assert any new theory of liability. Accordingly, Cha fails to carry his burden to demonstrate he is entitled to federal habeas relief on this ground, and the claim is **DENIED**.

### 5.    Ground Five:  Sentence Enhancement Based On Aggravating Factors

Cha was sentenced on August 14, 2003 to an aggravated term on Count Six for violation of CAL. PEN. CODE § 245(b) and received consecutive sentences. (Pet. 2:11.) He takes issue with the court, rather than a jury, having made particular findings in support of the upper term: (1) "the crime involved great violence, great bodily harm, threat of great bodily harm . . . , disclosing a high degree of cruelty, viciousness and callousness;" (2) the "victims were particularly vulnerable;" (3) he was convicted in Count Nine of probation violation (felon in possession of a firearm) "for which a consecutive sentence could have been imposed, but for which concurrent sentences are being imposed;" (4) under Rule 421(b), Cha "has engaged in violent conduct which indicates a serious danger to society;" (5) his "prior convictions or sustained petitions in juvenile delinquency proceeds are numerous and have increasing seriousness;" (6) he was on "probation at the time when the crime was committed, and his prior performance on probation was unsatisfactory." (RT 1320; Lodg. 3, p. 27.) Cha argues "[n]one of these facts were [sic] found by a jury beyond a reasonable doubt," purportedly denying him "his Sixth Amendment right to a jury trial and his Fifth and Fourteenth Amendment right to proof beyond a reasonable doubt of the aggravating factors utilized to impose a sentence greater than the statutory maximum." (Traverse 34:21-25.) He had raised this issue by way of a December 28, 2004 supplemental letter brief to the Court of Appeal after the United States Supreme Court decided Blakely

v. Washington, 542 U.S. 296, 305 (2004). (Lodg. 1A, 2A.) The Court of Appeal affirmed his conviction and sentence on May 12, 2005. (Lodg. 3.) The California Supreme Court denied Cha's Petition For Review on August 24, 2005 without reaching the merits.

The Blakely Court applied the rule of Apprendi v. New Jersey, 530 U.S. 466 (2000) to hold the facts supporting the petitioner's exceptional sentence in that case were neither admitted by the petitioner nor found by a jury, rendering his sentence a violation of the Sixth Amendment. Blakely, 542 U.S. at 303 (the sentence was within the indeterminate maximum for the category of the offense, but the trial court imposed a term in excess of the specific range set by state statute for the offense based on facts not found by the jury, rendering it constitutional). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490.

Cha relies for this claim on Apprendi, 530 U.S. 466, Blakely, 542 U.S. 296, and Cunningham v. California, 549 U.S. 270 (2007) (disapproving California's determinate sentencing scheme that authorized a judge, rather than a jury, to find facts exposing a defendant to an elevated upper term sentence because it resembled in all material respects the systems invalidated in Blakely and United States v. Booker, 543 U.S. 220 (2005) (holding the Sixth Amendment as construed in Blakely applies to the Federal Sentencing Guidelines, invalidating their mandatory application)). Cha argues this Court should apply Cunningham retroactively to his case, despite the prohibition against retroactive applications of new rules of law (see Teague v. Lane, 489 U.S. 288 (1989), on grounds the California Supreme Court, in denying his Petition For Review, expressly left open the possibility he might be entitled to some relief upon finality of People v. Black ("Black I"), 35 Cal.4th 1238 (2005), *judgment vacated by* Black v. California, 549 U.S. 1190 (2007), regarding the effect of Blakely and Booker, on California law. (Traverse 40:16-22.). However, even retroactive application of Cunningham would not entitle Cha to federal habeas relief because the Court of Appeal reasonably found he was properly sentenced based on facts found by the jury and determinations remaining within the trial court's discretion. The Court of Appeal first analyzed the controlling legal authority:

> In Blakely v. Washington, supra, 542 U.S. at p. -- [124 S. Ct. at 2537], the court held that a trial court may not impose a sentence above the "statutory maximum" based on additional facts not found by the jury beyond a reasonable doubt. The statutory maximum "is the maximum

- 26 -

sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." The court found that this case required the application of the rule it had expressed in Apprendi v. New Jersey (2000) 530 U.S. 466, 490: " '**Other than the fact of a prior conviction**, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (Blakely, supra, at p.-- [124 S. Ct. at 2536].) [Emphasis added.]

> **The holdings in Blakely and Apprendi do not apply when the exercise of judicial discretion is kept within a sentencing range authorized by statute for the specific crime of which the defendant is convicted by jury. (United States v. Booker (2005) 160 L. Ed. 2d 621, 543 U.S. --, -- [125 S. Ct. 738, 750] . . . .[¶]** Apprendi instructs further that a "sentencing factor" is distinguishable from a "sentence enhancement": the former is a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense"; the latter is "used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." (Id at p. 494, fn. 19.)
> . . . .
> Under California's determinate sentencing law, the court must exercise its discretion to select a term within the particular range (lower, middle, or upper) allowed for a specific offense. The court's discretion is informed by its evaluation of factors in mitigation and aggravation. These sentencing factors, consistent with the definition found in Apprendi, are weighed by the sentencing judge in determining the term of imprisonment within the specific offense's sentencing range. **If there are no such factors or neither the aggravating nor mitigating factors preponderate, the court shall choose the middle term**; **additionally, the court retains the discretion to impose either the upper or middle term where it finds the upper term is justifiable**. (People v. Thornton (1985) 167 Cal. App. 3d 72, 77.) **Such an exercise of discretion does not violate the constitutional principles set forth in Apprendi and followed in Blakely because the court's discretion is exercised within the specific statutory range of sentence**. [Citing Booker, 543 U.S. 220.]

(Lodg. 3, pp. 28- 29 (emphasis added) (parallel citations omitted.)

The Court of Appeal also thoroughly summarized the factual record from the sentencing transcript, and neither side disputes its accuracy. *See* Lodg. 3, pp. 26-27. The trial court imposed the aggravated term on count 6, ran the sentences on counts 2, 4, and 8 consecutive to count 6, and imposed a concurrent sentence as to count 9, reciting on the record it had "considered factors in aggravation and factors in mitigation" and found "no factors under Rule 434 of mitigation." (Lodg. 3, pp. 26-27.) In particular, dispositively for this analysis: "The defendant's prior convictions or sustained petitions in juvenile delinquency proceedings are numerous and have increasing seriousness,"

and he "was on parole -- probation at the time when the crime was committed, and his prior performance on probation was unsatisfactory." (Lodg. 3, p. 27.) The Court of Appeal concluded Cha was sentenced consistently with the legal principles identified in Apprendi and its progeny.

> First, we find that **the consecutive sentence imposed by the trial court was based on facts found by the jury.** The trial court imposed consecutive sentences because the crimes involved separate acts of violence. Counts 2, 4, 6, and 8 each involved a separate victim, each victim had been shot. The verdicts standing alone show that there were separate acts of violence. No further findings are necessary to reach this conclusion. The separate-victim finding is contained within the verdict itself. [Citation omitted.]
>
> Even if the court's inclusion of circumstances in aggravation as to the offense and some of the recidivist findings were not constitutionally allowable, **the court herein stated its choice of the upper term because of aggravating factors, which included the uncontested generic description of defendant's prior record of convictions. As Apprendi states, and Blakely agrees, prior recidivist conduct may be used by a sentencing judge, even absent a jury finding, to increase a defendant's term.** (Apprendi, *supra*, 530 U.S. at pp. 488, 490; Blakely, *supra*, 542 U.S. at p.-- [124 S. Ct. at 2536.]) **"Apprendi was absolutely clear in excepting the fact of prior convictions from its new rule."** (Thompson v. Superior Court (2001) 91 Cal.App.4th 144, 154.) **This prior-conviction exception to Apprendi has been construed broadly to apply not only to the fact of the prior convictions, but to other generic facts relating to the defendant's recidivism, including the defendant's status as a probationer or parolee at the time the current offense was committed.** [Citation omitted.] [¶] Under California law, a single factor in aggravation is sufficient to support the upper term. (People v. Osband (1996) 13 Cal.4th 622, 730.) . . . [¶] **Thus, even if the some of the aggravating circumstances are stricken, the remaining aggravating factors clearly preponderate and the court was within its discretion to order the upper term**. [Citation omitted.]

(Lodg. 3, pp. 30-31 (emphasis added).)

The "finality of People v. Black," reserved by the California Supreme Court in denying Cha's Petition For Review, does not entitle Cha to a different result. On remand in People v. Black ("Black II"), 41 Cal.4th 799 (2007), *cert. den. sub nom* Black v. California, -- U.S. --, 128 S.Ct. 1063 (U.S. Jan. 14, 2008), the California Supreme Court reviewed California's sentencing law, applying the Apprendi through Cunningham line of cases. Black II confirmed as long as a single aggravating circumstance that renders a defendant eligible for the upper term sentence has been established in accordance with the requirements of that jurisprudence, any additional fact-finding by the trial court when selecting the appropriate sentence range does not violate the defendant's right to a jury trial.

Black II, 41 Cal.4th at 813, 815 ("Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in Blakely, the defendant is not 'legally entitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum' "). "The United States Supreme Court consistently has stated that the right to a jury trial does not apply to the fact of a prior conviction." Id. at 818, *citing* Cunningham, 549 U.S. at --, 127 S.Ct. at 868, Blakely, 542 U.S. at 301, Apprendi, 530 U.S. at 490, and Almendarez-Torres v. United States, 523 U.S. 224, 243 (1998) ("[R]ecidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"). California Rule of Court 4.421(b)(2) only requires consideration of the number, dates, and offenses of the prior convictions alleged, and the relative seriousness of the alleged convictions can be determined merely by reference to the range of punishment provided by statute for each offense, rendering such determinations appropriately undertaken by a court rather than a jury. Black II, 41 Cal.4th at 819-20, *quoting* People v. McGee, 38 Cal.4th 682, 706 (2006).

As found by the Court of Appeal, Cha was eligible for the upper term by virtue of facts that were established consistently with Fifth and Sixth Amendment principles. The state court's rejection of sentence challenges is neither contrary to nor an unreasonable application of federal law, nor the result of unreasonable findings of fact. Accordingly, this ground for habeas relief is **DENIED**.

## III.   CONCLUSION

For all the foregoing reasons, **IT IS HEREBY ORDERED** Cha's federal habeas petition is **DENIED** in its entirety, terminating this action.

**IT IS SO ORDERED.**

**DATED: March 30, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**